PHARO. The WALTER W.  See Case No. 17,124.

## Case No. 11,064.

The PHEBE.

[1 Ware (263) 265.] [1]

District Court, D. Maine.  March 13, July 12, 1834.

BILL OF LADING—SHIPPER'S LIEN FOR BREACH OF CONTRACT — CHARTERED VESSEL — OWNER'S RIGHT TO CONTRADICT BILL OF LADING.

1. The shipper has a lien on the vessel for the execution of a contract by a bill of lading, entered into by the master, which may be enforced by process in rem in the admiralty.

[Cited in Mendell v. The Martin White, Case No. 9,419; The Panama, Id. 10,703; The Atlantic, Id. 620; The Flash, Id. 4,857; The Susan G. Owens, Id. 13,634; Wilson v. Pierce, Id. 17,826; McGuire v. The Golden Gate, Id. 8,815; Smith v. The Creole, Id. 13,033; The Hendrik Hudson, Id. 6,358; The Regulator, Id. 11,665; The Avon, Id. 680; The Champion, Id. 2,583; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 435. Cited in brief in Thomas v. Osborn, 19 How. (60 U. S.) 28. Cited in The China v. Walsh, 7 Wall. (74 U. S.) 68; The Maggie Hammond, 9 Wall. (76 U. S.) 451; Ex parte Easton, 95 U. S. 76; The T. A. Goddard, 12 Fed. 178; The Brantford City, 29 Fed. 385; The Wilmington, 48 Fed. 568.]

2. And it makes no difference in this respect whether the vessel is in the employment of the owner, or be let by a charter-party or parol agreement, on the condition that the hirer shall have the whole control of her.

[Cited in Stone v. The Relampago, Case No. 13,486; Hill v. The Golden Gate, Id. 6,491; Scull v. Raymond, 18 Fed. 550; The International, 30 Fed. 377; The Wilmington, 48 Fed. 568.]

3. In the latter case, if the shipper proceeds against the vessel for the fault of the master, in

1 [Reported by Hon. Ashur Ware, District Judge.]

not executing a contract entered into by a bill of lading. the owner may contradict the bill of lading by parol testimony. he being a stranger to the contract, and intervening as a third person for his own interest.

[Cited in The Illinois, Case No. 7,005.]

4. It is only those contracts which the master enters into in his quality as master, that specifically bind the ship and affect it by way of lien or privilege in favor of the creditor.

[Cited in The Zenobia, Case No. 18,208; The Edwin v. Naumkeag Steam Cotton Co., Id. 4,301; The Illinois, Id. 7,005; The Wilmington. 48 Fed. 568.]

This was a suit founded on a bill of lading. The libel alleged that on the 24th of August, 1832, G. W. McLellan, the libellant, shipped on board the Phebe, of which Otis Roberts was master, 136 tons of gypsum, consigned to Jabez Ellis & Son, of Boston, of the value of $259.78, the master to have for his freight all the net proceeds of the sales over that sum, for which he signed three bills of lading; that the master, instead of carrying the gypsum to Boston, stopped at Castine, transhipped it on board another vessel, and has never delivered it to the consignees. Perkins, the owner, filed a claim and put in an answer to the libel. alleging that on the first day of August, 1832, he let the vessel to Roberts, to be employed in the coasting trade, on a parol agreement. by which Roberts was to victual and man and have the entire control of the vessel. and that the owner was to have one half of her earnings for the hire of the vessel; that Roberts having taken the vessel on this agreement, to be employed solely by him and on his account, went with her to Eastport, and there purchased on his own account a quantity of gypsum, or plaster-of-paris. for which he paid in part and agreed to pay the balance to Ellis & Son; that after the plaster was laden, McLellan illegally compelled Roberts to give him a bill of lading of the plaster in question, as security for the payment of the balance due; that it was agreed between Roberts and McLellan that Roberts should sell the plaster, and from the proceeds of the sale, pay over the balance due to McLellan to Ellis & Son; that after the brig sailed, she became so leaky, by the dangers of the seas, that the master was obliged to put into Castine and there procure another vessel to carry the plaster to Boston; that Perkins, the owner, had no interest in the contract made by Roberts, and he prays that the vessel may be pronounced free from the lien, and delivered to him. The libellant, to prove his case, offered in evidence the bill of lading signed by Roberts, the master. The claimant, to prove the facts alleged in the answer, offered the depositions of the master and one of the crew. The master's deposition was objected to on the ground that he was interested in the result of the suit, and both were objected to on the ground that parol evidence was inadmissible to control the effect of the bill of lading.

C. S. Daveis, for libellant.

Mr. Longfellow, for claimant.

WARE, District Judge. The case has been argued on the allegations in the libel and answer, and on the admissibility of the evidence offered by the respondent. The general principle that the vessel is liable in specie to the shippers, for the non-execution of a contract of affreightment by a bill of lading, has not been controverted; but it is contended that the circumstances of this case take it out of the general rule. In the present case, the vessel was not in the employment of the owner. When a vessel is let by charter-party, and the charterer victuals and mans, and has the entire control of the vessel, the general owner is not responsible for the acts of the master. The charterer is substituted in his place, and becomes owner pro hac vice. There was, in this case, no charter-party in writing; but the vessel was let by a parol agreement, under which the hirer was to have the entire control of her. The owner had no right to interfere in any way in the employment of the vessel, while the contract remained in force. The master, also, was not appointed by him, and cannot therefore be considered as his agent, nor can he be held directly responsible for his acts.

It has been contended in argument, by the counsel for the libellant, that though the owner has divested himself of all right of control with respect to the employment of the vessel, yet as he receives for the hire of the vessel, not a fixed and stipulated sum, but a certain proportion of the freight and earnings, be they more or less, he is directly interested in the freight, and ought to be held jointly liable with the hirer. The principle on which the owner is bound for the acts of the master is supposed to be borrowed by the maritime law directly from the exercitory action of the civil law. He is not liable in his character of owner or proprietor of the vessel, but as employer, for that is the meaning of the word "exercitor." In that character he is responsible for the acts of the master, first, because he is his agent and is appointed by him, and subject to his orders, and secondly, because he is entitled to the earnings of the vessel. The definition of exercitor is, the person who receives the earnings of the vessel. "Exercitorem autem eum dicimus ad quem obventiones et reditus omnes perveniunt." Dig. 14, 1. 1, 15. As the profits of the vessel were to be equally divided between the general owner and the charterer, it is contended that they are liable as joint exercitors; that the form of the contract constituted them, in fact, partners in the business carried on by the vessel. The argument is certainly not without force, and would deserve to be maturely considered if the question could be considered as an open one in this country. But it is too firmly settled by judicial decisions to be now brought into controversy. The cases of Reynolds v. Toppan, 15 Mass. 370, Taggard v. Loring. 16 Mass. 336. Thompson v. Snow, 4 Greenl. 268, and Emery v. Hersey, 4 Greenl. 407, have fixed

the legal construction of a contract like this. The general principle is that when, by a contract of charter-party, the charterer takes the vessel into his own possession and control, and navigates her by his own master and crew, he alone is responsible for the acts of the master: and these cases decide that it makes no difference, in this respect, although the owner may be so far interested in the voyage that he receives for the hire of his vessel a certain proportion of her earnings, instead of a fixed sum. Although this mode of determining the hire of the vessel gives to the contract the aspect of a partnership transaction, it is not admitted to draw after it the consequences of a partnership, but is considered merely as an equitable mode of ascertaining the charter, or the real value of the use of the vessel. And the rule of construction applied to contracts in this form, is analogous to the other decisions of the maritime law, and the law merchant. It was formerly a common practice, and is now perfectly legal for seamen to engage, not for wages, at a fixed and stipulated price, but for a share of the freight and profits of the adventure. It is still customary in some branches of business, as in the fisheries, both in the cod and whale-fisheries, for seamen to engage on shares, by which they become directly interested in the profits of the voyage; but contracts of this kind have never been considered as constituting partnerships, in the proper sense of the word, and the incidents belonging to a contract of partnership have never been considered as applicable to them. So a clerk may agree with a merchant to receive as a compensation for his services a certain portion of the profits of the business, instead of a fixed salary, without being involved in the liabilities of a partner; that is, he may stipulate for a contingent compensation, to be ascertained by some future event, and that event may be the issue or success of the business in which he is employed. 3 Kent, Comm. 33. The distinction is, whether he is interested in the profits, as profits, or whether recourse is to be had to them only to determine the measure of his compensation. The distinction savors, it is true, of refinement and subtlety, and its solidity and justice has been questioned by high authority (Ex parte Hamper, 17 Ves. 404), but it is too firmly established to be now brought into doubt. The principle is applied, in the cases cited, to the hire of a vessel upon the terms on which this was hired. If, then, this action had been brought against the owner in personam, it could not have been sustained.

Inasmuch as the owner cannot be held directly and personally responsible in this case, it is contended that he cannot be indirectly held, by subjecting his property to this responsibility. The argument is, that the liability of the vessel is merely collateral or accessory to that of the owner, and stands in the nature of a surety or pledge. This objection admits of two answers. In the first place, conceding it to be correct in principle that the liability of the vessel is only collateral and subsidiary to that of the personal responsibility of the owner, by the owner in this case is meant, not the proprietor but the employer. Roberts, the charterer, is for this purpose the owner; he is the exercitor, and it is to the quality of exercitor or employer that the liability is attached. Allowing, then, the liability of the vessel to be not primary but collateral, it is collateral to that of Roberts. But the argument is founded on a misconception of the true principles of the law. This rule, by which the vessel is bound in specie for the acts of the master, is not derived from the civil law, but has its origin in the maritime usages of the middle ages; and it is to these usages that we must look to ascertain its true character. The civil law considered the master as the simple præpositus, or agent of the owner or exercitor, and authorized him to bind his principal in all matters relating to the business with which he was intrusted. Dig. 14, 1, 1, 7. The act of the master, while acting within the limits of his authority, bound the principal in the same manner as it would if it had been the act of the principal himself. If there were several exercitors, each was bound in solido, that is, to the full amount of the obligation contracted by the master, because he was the præpositus of each exercitor; and also in favor of the creditor, ne in plures adversarios distringatur qui cum uno contraxerit. Dig. 14, 1, 1, 25; Id. 14, 1, 2. The exercitor was equally bound for the acts of the master, whether the obligation was ex contractu or ex delicto, and whether resulting from the fraud or negligence of the master; not indeed by the exercitory action which relates exclusively to the contracts of the master, but by other appropriate actions of the law. Huber. Prælect. Jur. Civ. Lib. 14, 1, 8; Dig. 4, 9, 3, 1; Id. 4, 9, 4; Id. 44, 7, 5; Id. 47, 5, 1; Voet, ad Pand. 14, 1, 7. But for the obligations of the master ex delicto, if there were several exercitors, each was bound only for his own proportion. Dig. 4, 9, 7, § 4 and 5. But by the maritime usages and customs of the middle ages, which, having been generally adopted by merchants, silently acquired the force of a general law, the master, who was ordinarily a part owner (see Consulat de la Mer, passim, particularly chapters 46–57, or chapters 1–11 of the edition of Pardessus. Jugemens d'Oleron, art. 1; Droit Maritime de Wisbuy, Pardessus Ed., art. 15; Collection des Lois Maritimes, p. 470, note 7), was not considered as properly the agent or mandatary of the other part owners, but rather as the administrator of the property, that is, of the vessel which was intrusted to his care and management. He was authorized to employ it for the common benefit of all the owners, more in the character of the acting partner of a societé en commandité, or limited partnership, than

in that of agent for his co-owners. As the gerant or active partner, he was authorized to act for the other owners, and bind them in all matters relating to the employment of the vessel, to the extent of their interest in it; or to speak more correctly, to bind the property itself which was confided to his administration; but his authority did not extend to a sale of the ship without the express consent of his co-owners, except in a case of necessity. Consulat de la Mer, c. 256. The ship and freight were pledged for the fulfilment of these obligations, and might be seized and sold to satisfy them. This is evident from many chapters of the Consulate of the Sea, the most complete and authentic record of these primitive usages and customs. Consulat de la Mer, cc. 58, 63, 72, 138, 186, 193, 227. Thus all the contracts of the master with the mariners for their wages, with material-men, for repairs and supplies of rigging, or for provisions, or other necessaries for the vessel, involved a tacit hypothecation of the ship and freight. But he was not authorized, in his character as master, and as representing his co-owners, to bind them beyond the value of their share in the ship and freight. To do more than this, he must have a special power for that purpose. Consulat (Boucher's Trans.) c. 34. He was the agent or representative of the other owners, only so far as they had confided their capital to his administration. If the vessel was lost before the creditors were paid, they had no remedy except against the master. The other part owners were discharged from all responsibility. Let the lender, then, says the Consulate, take care how he lends, for the owners lose enough when they lose their shares. Chapter 239, or 194 of the edition of Pardessus. The master could not, therefore, in the proper sense of the word, bind the owners, personally, at all, because they could always withdraw themselves from their personal responsibility by abandoning the ship and freight. 2 Pard. Lois Mar. p. 235, note.

If there were some exceptions to the general rule, in cases where the other part owners were present, and unreasonably refused to contribute their proportion towards the necessary repairs and outfit of the ship, as in the case mentioned in the Consulate (chapters 239 and 245; and see note of Pardessus cited above), these are but exceptions standing on their own peculiar reasons, and applied only when the owner was present, and when it might be imputed to them as a fault that they unreasonably refused to contribute to the necessary expenses of the ship. But in a foreign port, or where the owners were not present, and the master was acting under the general authority which the law or custom gave him as master, he could only bind the ship and freight. It was for this reason that Emerigon, whose mind was deeply imbued with the maritime traditions of the middle ages, says that the liability of the owners to answer for the acts of the master is rather real than personal. The legal power of the captain, says he, does not extend beyond the limits of the vessel of which he is master, that is, administrator. He cannot bind the other property of the owners, unless he have a special power for that purpose. Contrats a la Grosse, c. 4, § 11. There was the same limitation of the responsibility of' the owners, whether the demand of the creditor was founded on the contract or tort of the master, or whether the damage for which he sought reparation resulted from the fault of the master, or the defects or insufficiency of the vessel, or her tackle or apparel. Consulat de la Mer, c. 227 and 63–72. Whenever a merchant formed any engagement with the master, he could look for his security only to the master himself, and to the capital of the owner, the administration of which was confided to him, that is, the ship and the freight. Thus we find, when the principle is traced back to its source, that it is by no means correct to say that the liability of the vessel is merely collateral or accessory to that of the owner. On the contrary, in the origin of the custom the primary liability was upon the vessel, and that of the owner was not personal but merely incidental to his ownership, from which he was discharged either by the loss of the vessel or by abandoning it to the creditor. But while the law limited the creditor to this part of the owner's property, it gave him a lien or privilege against it in preference to his other creditors. This limitation of the responsibility of owners, though generally if not universally received by the maritime states of continental Europe, at least so far as relates to obligations arising from the faults of the master, has never been adopted in England or in this country, as a mercantile usage or customary law. Several acts of parliament have limited the responsibility of owners for the tortious acts of the master, to the value of the ship and freight, but the common, like the civil law, holds the owner responsible without limitation. Abb. Shipp. pt. 3, c. 5. And what is alone material in this case, the principle that the ship and freight are bound for the acts of the master, has been incorporated into the maritime jurisprudence of England, though from the limited jurisdiction of the admiralty, the shipper cannot have the full benefit of it. Abb. Shipp. p. 93. In this country the lien is not only acknowledged, but is enforced by our courts of admiralty. And having been borrowed from the general maritime law, or the customs and usages of the sea, we must look to them, rather than to our own peculiar maritime jurisprudence, for its true character and the cases to which it applies. By that law, the master's authority to bind the vessel is the same, whether he is appointed by the owners, or the ship is let to him by a charter-party. The Consulate

of the Sea (chapter 289) presents a case of the letting of a ship by a contract identical in all its conditions with this, (the contracts of commenda or commande,) to be employed by the hirer for a share of the profits, and the ship is declared to be liable in the hands of the hirer, and he to be answerable to the owners. Whoever deals with the master, in all cases where he is acting within the scope of his authority as master, is entitled to look to the ship as his security. There is, therefore, no foundation in law for the distinction insisted upon by the respondent's counsel. Nor has it any more foundation in reason or mercantile policy. If this privilege is given as an additional security to the merchant, the reason for it is quite as strong, to say the least, when the ship is employed under a charter-party, as when it is in the employment of the owner. The owner has his remedy against the charterer.

The other question is, whether the respondent can, in this case, be admitted to contradict, by parol evidence, the bill of lading executed by the master. The question is not whether the master can himself contradict it, or the employers of the vessel by whom he is appointed and for whose acts they are responsible. The proprietor in this case intervenes as a third person, who has no interest in the contract between the master and shipper. The rule of law that parol evidence shall not be admitted to control or contradict a contract reduced to writing, applies between those who are parties to it and those who represent them or derive their rights from them. It does not apply against third persons, whose rights may be incidentally affected by the contract. Admitting, then, that the bill of lading is conclusive against the master, which is undoubtedly true as a general rule, it does not follow that it is so against the respondent, who is a stranger to the contract. It would open a wide door for fraud if third persons could in this way be precluded from proving the truth. The bill of lading, says Valin, is conclusive against the assured, and nothing can be admitted against its tenor. 2 Valin, Comm. p. 139. He is a party to it. But it is not conclusive on the insurers. They may disprove it by every species of legal evidence. Emer. Ins. c. 11, § 3; 2 Valin, Comm. p. 144. Nor is the bill of lading conclusive against other shippers, in cases of jettison and contribution. Valin, Sur Ordonnance de la Marine, liv. 2, tit. 3, art. 7; Id., liv. 3. tit. 8, art. 9. "The nautical laws of all times, have," says Boulay Paty, "given to the bill of lading the character of proof; it is received not only between the master and merchant shipper, but also against the insurers and all other persons, saving the right to prove fraud or collusion. It is beyond doubt, that third persons, who are not parties to the bill of lading, have a right to contradict and prove its incorrectness by every species of proof."

2 Cours de Droit Mar. p. 306. The proprietor, who in this case is a stranger to the contract, may, on the principles both of the common and maritime law, be admitted to explain and contradict it by every species of legal evidence.

After the foregoing opinion was delivered, the cause was continued on the motion of the libellant, to enable him to introduce further evidence in support of the libel. The principal evidence was the testimony of Mr. Buckman, who at the time of the transaction was a clerk in the store of the libellant. He stated that Roberts, in the first place, purchased 220 1-2 tons of plaster, of McLellan, on account of the owners; that the original intention of Roberts was to carry the plaster to New York, but that after the brig was loaded, it was found that she leaked so badly that it was necessary to take out part of the cargo, namely, about eighty tons; that the sale was then rescinded, and the destination of the vessel changed to Boston; and that it was agreed that the master should carry the plaster which remained on board, on freight, and receive for the freight all the proceeds of the sale over $259.78, which was the price he had agreed to pay for it.

The respondent offered the depositions of Roberts, the master, and Gray, one of the hands. Gray stated that when Roberts arrived at Eastport he went to McLellan, and asked him to put on board a cargo, on freight; that McLellan declined, on account of the low price of plaster, and that Roberts afterwards purchased of him a cargo of plaster, intending to carry it to New York, but on account of the leaky state of the vessel part of it was relanded by the order of McLellan. Roberts, in his deposition, says that he purchased the plaster of McLellan, and that, after the vessel was loaded, McLellan required him to sign bills of lading of the plaster as being shipped by him, as security for the sum due for the purchase, and for cash advanced; and that after the bills were signed, McLellan agreed that instead of delivering the plaster to Ellis & Son, he might sell it, and pay over to them the sum due, that is, $259.78, and that he, not being much acquainted with bills of lading, thought that he might properly enough sign the bills, as he was requested.

WARE, District Judge. It has been suggested at the argument that after the Phebe put into Castine, and the cargo was transhipped into another vessel, it was actually carried to the port of destination, although it is not pretended that it was delivered to the consignees, or the proceeds of the sale deposited with them. But it is argued that the Phebe having been disabled by the dangers of the seas from pursuing the voyage, and the goods having been transhipped to be conveyed in another vessel, she is discharged from the lien, and that, if any exists, it at-

taches to the vessel to which they were transferred. The argument proceeds on the assumption that the Phebe was prevented from performing the voyage and delivering the cargo, according to the terms of the bill of lading, by the dangers of the seas. But the fact, according to the evidence, was otherwise. It appears that she was in a leaky condition when the plaster was taken on board, and without meeting with any bad weather, or any accident, she was obliged to put into port because she was, in fact, unseaworthy and unfit for the voyage. The goods were laden on board the Phebe, and she became bound for the performance of the contract, supposing it to be a contract of affreightment, unless she was prevented by some of the perils excepted in the bill of lading. Whether the other vessel into which they were transhipped, might not also be liable, is a question which does not arise in this case.

But the principal question which arises on the new evidence is, whether there was in this case a bonâ fide contract of affreightment, or whether it was a contract for a sale of the goods, disguised under the form of an affreightment. I agree with the respondent's counsel, that if this bill of lading was used merely as a disguise to cover a sale, or if it were an arrangement resorted to as a security for the payment of the purchase-money, it could create no lien on the vessel; and if such were the contract, it is immaterial whether the purchase was made by the master on his own account, or on the account of his owners. In neither case would the vender be entitled to a lien on the vessel for his security. It is only those contracts which the master makes in his quality as master, that specifically bind the ship, and affect it by way of a lien or privilege in favor of the creditor. But is there any evidence that this was not a bonâ fide contract of affreightment? It is proved by a bill of lading in the usual form. Though this is not binding and conclusive with respect to third persons, it is, with respect to them, evidence of a high character. It may be impeached; but it is not lightly to be presumed that parties, who put their contracts into writing with all the usual forms and solemnities which belong to it, intend a different contract from that which the written agreement plainly expresses. It belongs to him who impeaches it to show by satisfactory evidence that it is a simulated contract.

The first circumstance relied on for this purpose appears on the face of the paper. The master was to receive for his freight, not a fixed and certain sum, but all that the plaster should sell for over a certain sum. This is an unusual mode of settling the amount of freight, but there is nothing illegal in such an agreement. The master could lose nothing but the run of the vessel, for he would be discharged by delivering the cargo to the consignees, and for his compensation he might be willing to take the risk of the market. Another circumstance relied upon is, that at the time when the bill of lading was executed, a bill of parcels was delivered by McLellan to the master, in which 220 tons of plaster was charged to the brig, with some other small charges, and credit was given for the plaster returned, and the account was balanced by this sum of $259.78, to be paid to Ellis & Son, as per bill of lading. It is argued that this paper shows clearly that there was a sale of the plaster, and that the bill of lading was only given as a security for the payment. But this paper is not a contract nor legal evidence per se of a contract. It is but a memorandum of one of the parties, and is satisfactorily explained by the parol evidence. It is proved that in the first instance there was a sale of the plaster, and when it was found, from the leaky condition of the vessel, that she was unfit for the intended voyage to New York, eighty tons of the plaster was relanded, and the voyage changed from New York to Boston. Buckman, the clerk of the libellant, says that the contract was rescinded and a new agreement made, by which the master was to take the plaster on freight. Roberts says that although the plaster was consigned to Ellis & Son, he was authorized to sell it and pay over the amount named in the bill of lading, instead of delivering the plaster to Ellis & Son. Now as Roberts was to have for freight all that the plaster should sell for over a certain sum, and that if it sold for no more he would have nothing, it was but reasonable that he should have the power of trying the market, and getting the best price that could be obtained. The memorandum given to Roberts may be considered as giving him an implied authority to sell the plaster and pay over the balance of the amount, instead of delivering it to the consignees. The only evidence opposed to this view of the transaction is that of Roberts himself. He says that the bill of lading was given merely as a security for the payment of the purchase-money. Now, waiving all objection to the admissibility of his testimony, as a witness to impeach an instrument to which he is a party, his testimony alone and unsupported, for Gray, the other witness, left the vessel before she sailed, is insufficient to overbalance the credit due to the bill of lading, sustained as it is by the direct testimony of Buckman.

[NOTE. The vessel was sold on the issuing of a venditioni exponas, and the counsel for libelant subsequently moved for a rule on the marshal to pay into court the residue of the money for which the brig was sold. The motion was granted. Case No. 11,065. A motion was thereupon made, by the counsel for the actor, for a monition to Perkins, the purchaser, to show cause why he should not pay to the marshal the balance of the purchase money, which is unpaid. The motion was granted. Id. 11,066.]